## MAGNOLIA PETROLEUM CO. v. HOWARD.

### No. 4292.

United States Court of Appeals, Tenth Circuit.

Dec. 21, 1951.

Robert W. Richards, Oklahoma City, Okl. (Earl A. Brown, Ardmore, Okl., on the brief), for appellant.

A. G. Windham and George Windham, Poteau, Okl. (Foster Windham, Carlsbad, N. M., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

Magnolia Petroleum Company entered into a contract with appellee, L. C. Howard, in which he, as consignee, agreed to sell and distribute petroleum products furnished by Magnolia. Howard had charge and control of storage tanks (a bulk plant) in Poteau, Oklahoma, where the products furnished by Magnolia were stored. There were separate underground storage tanks for kerosene, regular gasoline, ethyl gasoline and diesel oil. Howard withdrew kerosene and gasoline from these tanks as he sold it to customers, under his contract with Magnolia. Howard sold a quantity of kerosene, delivered to him by Magnolia, to T. D. Dobson, a retailer at Panama, Oklahoma. He, in turn, sold some of it to Russell S. Skelton, who together with his daughter, was burned to death as a result of an explosion of a heating stove, when he used some of the kerosene in starting a fire. Magnolia was sued in two actions for damages resulting from these deaths. It settled the litigation for $27,500. In this action it sought to recover that amount from Howard under a provision in the consignment contract providing that "The consignee assumes all liability for loss and damage of whatever character sustained by consignor or third parties, resulting from the acts of consignee or his employees and servants."

It is conceded that the kerosene received by consignee from Magnolia, when sold by Howard, did not comply with the standards

for kerosene adopted by the Corporation Commission of Oklahoma.[1] It seems to be conceded that the kerosene in question became contaminated with gasoline, resulting in a flash test much lower than the flash test of not less than 120 degrees F. Tagliabue open cup, provided for in the regulation. Appellee's liability to Magnolia under the indemnity clause of his contract depends upon whether he or his employees negligently caused the contamination or, if not, whether they knew or, by the exercise of reasonable care, should have known when they sold it that there was a question whether it was thus contaminated.

The case was tried to a jury under instructions by the court, which are not challenged on appeal. The jury decided the issues in favor of Howard and Magnolia has appealed. Three assignments of error are set out in Magnolia's brief. They are, however, argued under the single proposition that "There is no substantial evidence to support the verdict of the jury."

On appeal we inquire only to ascertain whether there is substantial evidence to support the verdict and judgment of the court. A verdict based on such evidence and approved by the trial court is conclusive and will not be disturbed on appeal.[2] Magnolia introduced record evidence as to the manner in which kerosene was tested before delivery to make sure that it met the statutory safety requirements test. A Magnolia loader testified that he drew a sample from each truck after it was loaded and waited until the laboratory tested the sample for flash point and gave him an okay, before letting the truck leave the refinery. Clark, another witness, testified that records were kept of these tests and, from these records, he found that a sample had

been taken from the truck load delivered to Howard and that it showed that it had a flash point of 136 degrees Fahrenheit. He further testified that he did not make the test in question and that it could have been made by any one of thirty testers. No witness was produced who made or had actual knowledge of the making of the test or of the method or correctness of the test shown to have been made by the company's records. Appellee was, of course, unable to attack or impeach the correctness of this record evidence. The fact that this record evidence was uncontradicted did not require the jury to accept it as true.[3] That is especially true here, since the persons who made the test and had actual knowledge thereof, or the method of making the test, or the correctness of the test, as reflected by the records, were not produced as witnesses. Under these circumstances, the weight to be accorded to these records was a question for the jury.

The manner in which the load of petroleum products in question was handled and the question whether appellee Howard was guilty of negligence at any time is established largely by the testimony of Frank Ramsey, the truck driver who delivered it, H. L. Vaughn, his superior, Robert Howard, an employee of appellee, and appellee himself.

Ramsey testified that this particular load consisted of one compartment of ethyl gas, one compartment of regular gas, and one compartment of kerosene; that the regular gas was in the front compartment, the kerosene in the middle compartment, and the ethyl gas in the back compartment; that he arrived at appellee's bulk station at about 3:00 a. m. in the morning where he met Robert Howard; that Robert got the keys

1. Pursuant to statutory authority, the Oklahoma Commission adopted the following standard for first grade kerosene, or coal oil, or burning oil: "First grade kerosene or coal oil or burning oil shall have an A. P. I. gravity of not less than 40 degrees with flash test of not less than 120 degrees F. Tagliabue open cup."

2. Dyess v. W. W. Clyde & Co., 10 Cir., 132 F.2d 972; Cochran v. Order of United Commercial Travelers, etc., 10 Cir., 143 F.2d 82; Hammond v. Tate, 10 Cir., 83

F.2d 69, 105 A.L.R. 433; F. W. Woolworth Co. v. Davis, 10 Cir., 41 F.2d 342, certiorari denied 282 U.S. 859, 51 S.Ct. 33, 75 L.Ed. 760; Larabee Flour Mills Co. v. Carignano, 10 Cir., 49 F.2d 151.

3. Great Southern Trucking Co. v. National Labor Relations Board, 4 Cir., 127 F.2d 180; Railway Mail Ass'n v. Chamberlin, 8 Cir., 148 F.2d 206; Rosenberg v. Baum, 10 Cir., 153 F.2d 10, and cases cited therein.

to the station and that they then proceeded to unload the gasoline and kerosene; that the underground tanks had pipes extending to the top of the ground; that hose were attached to valves on the truck compartments and were then inserted into the appropriate pipes from the underground storage tanks; that when the valves were opened, gravity caused the gas and kerosene to flow into the underground tanks to which the hose was attached. He testified that Robert helped in the unloading; that while he attached the hose to the pipes or valves underneath the truck, Robert was placing the open end of the hose into the underground storage tanks; that after he had attached the hose to the truck, he asked Robert if he was ready for him to open the valves and, receiving an affirmative answer, opened the valves; that he had a leak at the connection of the kerosene hose; that Robert went to get a five gallon can to catch the run-off; that on his return with the can, Robert asked if the drippings from the hose were kerosene and, being informed that they were, said: "My Goodness! Shut it off"; that he thereupon closed the valves; that after closing the valves they discovered that they had placed the hose in the wrong storage tanks. He testified that after they shut off the valves Robert called appellee and Ramsey placed a call to H. L. Vaughn, his superior; that they ran no more products from the transport to the storage tanks until after appellee came to the station some hours later. Ramsey testified that he overheard appellee's end of the conversation with Vaughn, in which appellee stated to Vaughn that he had a saw mill customer to whom he could dispose of the mixture, resulting from running the kerosene into the wrong tank. He further testified that the pipes leading from the compartment of the truck were labeled with the kind of fuel contained therein; that at the time Robert Howard made the statement that they had placed the kerosene in the wrong storage tank, the hose

leading from the truck to the opening in the storage tanks were not crossed; that thereafter they crossed the hose leading from the kerosene and gasoline compartments into the proper storage tank.[4]

Robert Howard testified that all he did was to unlock the fill pipes of these underground compartments. He denied that he placed the ends of the hose into any of these compartments and testified that Ramsey put the hose into the fill pipes and turned the gas on and let it drain. He testified positively that he unlocked the underground tank containing the mobile gas; that Ramsey then connected the hose and put it in the pipe; that he then walked over and unlocked the kerosene tank and Ramsey put the hose in that fill pipe; that the hose from the kerosene compartment and from the regular gas compartment were crossed at all times; that he thought that the hose were hooked up wrong because they were crossed and called Ramsey's attention to it. He testified that after the valves were shut off he stated that he would have to call his brother and that Ramsey replied that, in that event, he would have to call Vaughn and that it might cost him his job; that he replied that it did not make any difference about his job to him that he wanted to know whether the hose were correct or not; that he then went and got his brother, the appellee. He testified that the only service he ever performed in unloading trucks was to first get up on the transport to see if the tanks were full to the mark; that if they were up to the mark he did not do anything else but unlock the fill pipes for the drivers.

L. C. Howard, the appellee, testified that when a transport driver comes in with a load they get the keys to unlock the fill pipes; that they unlock the fill pipes and then go up on the truck and check to see if it is full and the driver then goes

4. Each of the underground storage tanks had a label attached, designating the kind of fuel contained therein. From the way the truck was parked and from the manner in which the kerosene and the regular gasoline were loaded in the truck compartments, it was necessary to cross the hose leading from these two compartments to the underground storage tank, in order to properly unload the kerosene and regular gasoline.

ahead and unloads; that he and his helpers never put the hose in the tank for the driver. He testified that, when he came to the station in response to the call, Ramsey told him they thought they got a mixture and that Ramsey said that the hose were crossed; that appellee asked him how he had his truck loaded, to which Ramsey replied that he had gasoline in the front compartment and kerosene in the next one; that he then stated to Ramsey that if that was the way he had his truck loaded the hose were all right. He then went up on the truck and dipped his hand down in the fuel to check which was gasoline and which was kerosene and stated that "If that is the way it was hooked up, it is hooked up right" and Ramsey said "That was the way it was hooked up"; that he asked them if the hose had been moved and changed and they said it hadn't, that it was just the way they left it, and that Ramsey said he told them it wasn't hooked up wrong to start with. He further testified that at that time the front compartment, which contained regular gas, was full, while the second compartment, which contained kerosene, was down about five or six inches.

Concerning his conversation with Vaughn, he testified that he talked to him before he reached the station; that Vaughn stated that they had called him and told him they thought they had a mixture, to which appellee replied that in that event they would have to pick it up and take it back; that after he reached the station and made a check, he called Vaughn and told him how he had found things and stated that if everything from the beginning was like it was when he got there, it was all right; that the hose were hooked up right to the right compartments. Concerning the saw mill conversation, he testified that in the first conversation Vaughn asked him if there was a mixture, if he could not sell it to a saw mill, to which he replied that he just had two saw mill accounts and that they would not use that much kerosene in a year; a barrel or two a month was about all they used. He further testified that, when he came to the station, Ramsey had a can off of the truck

and he poured some of the fluid out, trying to flash it.

Vaughn, so far as material, testified that in the telephone conversation with appellee, appellee stated that he had a mixture down there and he did not think it was enough to amount to anything and he would go ahead and keep it; that he told him "I just did not want to take any chances, that I would rather load it up and bring it back"; that appellee said that they tried to flash it and it wouldn't flash and that they had a saw mill out there where they could sell some kerosene; that they bought kerosene from him and put gasoline with it when they bought it.

There was an irreconcilable conflict in the testimony of Ramsey and Vaughn on the one hand and Robert Howard and appellee on the other, which it was the duty of the jury to resolve. If the two hose draining the kerosene and regular gasoline compartments of the truck were crossed at all times, because of the way the compartments were loaded, kerosene was flowing into its proper storage tank and no adulteration with gasoline resulted during the unloading operations. Robert Howard testified that they were so crossed from the beginning and that this was what challenged his attention, because he had never seen them crossed before when kerosene and gasoline were being unloaded simultaneously. According to appellee's testimony, when he arrived on the scene, they made a thorough check and all agreed that the two hose were properly crossed and the unloading operations thereupon continued. According to appellee's testimony, he was advised that the hose were then as they had been from the beginning.

If these were the facts, as told to appellee when he arrived at the station, it cannot be said as a matter of law that he was guilty of negligence. Whether he had a right to rely thereon or, as a reasonably prudent person, nonetheless should have taken additional precautions raised at most an issue of fact for the jury. It was for the jury to say whether these facts were related to him and, if so, whether as a reasonably prudent person he was warranted in

relying thereon, or should have taken additional precautions. The jury resolved these questions in favor of appellee and against appellant. The verdict and judgment based thereon are supported by substantial evidence and the judgment is therefore affirmed.