257 F.2d 93
 76 A.L.R.2d 385
 MILLERS' NATIONAL INSURANCE COMPANY, CHICAGO, ILLINOIS, et
al., Appellants and Cross-Appellees,
v.
The WICHITA FLOUR MILLS COMPANY, Appellee and Cross-Appellant.
The WICHITA FLOUR MILLS COMPANY, Appellee and Cross-Appellant,
v.
MILLERS' NATIONAL INSURANCE COMPANY, CHICAGO, ILLINOIS, et
al., Appellants and Cross-Appellees.
 Nos. 5674, 5675.
 United States Court of Appeals Tenth Circuit.
 June 9, 1958, Rehearing Denied July 9, 1958.
 
 O. B. Eidson, Topeka, Kan., and Lawrence Weigand, Wichita, Kan. (Donald A. Bell, Wichita, Kan., James W. Porter, Topeka, Kan., Depew, Stanley, Weigand, Hook & Curfman, Wichita, Kan., of counsel, and Lillard, Eidson, Lewis & Porter, Topeka, Kan., of counsel, on the brief), for appellants and cross-appellees.
 Malcolm Miller, Wichita, Kan. (George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris and Gerald Sawatzky, Wichita, Kan., on the brief), for appellee and cross-appellant.
 Before BRATTON, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 On its claim of an explosion loss, appellee, The Wichita Flour Mills Company,[1] recovered a judgment for $109,468.08, plus interest, against the eighteen appellant insurance companies.[2] Defendants admit that their policies cover loss by explosion and assert that there was no explosion but rather a structural failure for which they are not liable. Trial was to a jury which resolved the issue in favor of the plaintiff. By way of cross-appeal Flour Mills Company contends that the trial court erred in not allowing judgment for attorneys' fees under the applicable Kansas statute and in not allowing all items of interest to which it is entitled.
 
 
 2
 Plaintiff owned and operated grain storage bins in Wichita, Kansas. It had two groups or batteries of bins which were originally built in 1925 and which, though structurally separate, were served by the same head house. In the head house are the facilities to raise the grain from the ground to the tops of the bins for distribution to the individual bins through a system of belts and trippers operating in what is known as a gallery.
 
 
 3
 We are concerned with the south battery and particularly with interstice bin 314 which was surrounded by circular bins 105, 106, 505 and 506. The circular bins were in two parallel rows of three each. The interstice bins occupied the spaces between the circular bins with straight walls connecting the walls of the circular bins.
 
 
 4
 The total height of the structure was approximately 100 feet. The gallery was about ten feet below the roof. The bottom of the bins was 90 feet below the gallery floor. The bins sat on a concrete slab. Below the slab was a tunnel in which were located the facilities for removing grain from the bins.
 
 
 5
 On July 2, 1952, Flour Mills Company was engaged in filling interstice bin 314 with new wheat received from the harvest then in progress. There was no grain in any of the surrounding bins. Late in the afternoon bin 314 had been filled to within nine feet of its capacity and contained 2,323,740 pounds of wheat. Loading was continuing at the rate of about 6,000 bushels of wheat an hour. A breakout occurred affecting on the east the straight wall of interstice bin 314 and the adjoining portion of circular bin 505. On the west the straight wall of 314 and the adjoining wall of circular bin 106 gave way. The lower 25 or 30 feet of these walls were ruptured and the wheat burst out. The interior north and south walls of 314 and the interior walls of 106 and 505 were also damaged. On the east wheat poured out on the ground for a distance of about 85 feet. On the west the wheat pushed a boxcar onto its side. Some heavy slabs of concrete were 45 feet, and other pieces of concrete 70 to 75 feet, from the bins.
 
 
 6
 Shortly before the breakout, Graves, an employee of plaintiff, measured the height of the wheat in 314 and found it to be nine feet from the top. He returned to the head house and when about 135 feet from bin 314 and facing north and away from 314 he felt a 'whoof' of air on the back of his head 'just like someone had turned a giant big fan loose.' This occurrence was so unusual that he went back to see if the conveyor belt and tripper were still operating. He found that they were functioning properly. He then returned to the ground floor, learned of the breakout, and turned off the machinery to stop the flow of wheat.
 
 
 7
 Two railroad employees, working in the near vicinity, heard an unusual noise and saw clouds of dust. One stated that he saw 'a lot of dust and stuff flying through the air, which I found out to be concrete chunks.' A woman who lived near the elevator heard an 'extra boom or bang sound out of the ordinary.' One elevator employee testified that he saw a cloud of dust that 'was black in color, just a big black ball' and that it was blacker than wheat dust with which he was familiar.
 
 
 8
 Several witnesses, including some elevator employees, testified that they heard no unusual sound. There was no evidence of any flash, odor, burning or charring and there was no apparent disturbance of dust in the gallery area.
 
 
 9
 Two young defense witnesses testified that about 15 minutes before the breakout they noticed a crumbling or cracking of concrete at the base on bin 106 and also the fall of a piece of glass.
 
 
 10
 The walls of the circular bins surrounding 314 were shifted or displaced in some instances by as much as 15 inches. The concrete-slab base of the bins was damaged and showed spalling, fresh shears and cracks which appeared most serious at locations immediately below the bin walls. One crack went all the way through the slab. At places the walls of the bins were displaced outward. There was spalling, shearing and cracking of the upper portion of the bin walls. One of the beams supporting the gallery floor was dislodged and broken away. No stretching or elongation of the steel reinforcing rods was found.
 
 
 11
 The evidence is clear that, at the time of loading the bins with wheat, dust is always present and that there are often in the wheat bits of foreign material capable of producing a spark which will set off a dust explosion. Such explosions are recognized hazards in the grain elevator business.
 
 
 12
 The experts who testified agreed that the storage of wheat in plaintiff's bins imposed the greatest load on the bottom 25 to 30 feet. Primary damage to the bins occurred in such area. Plaintiff's expert witness McDonald expressed the opinion that a flash explosion occurred in the gallery above bin 314 where the spouts from the tripper were dumping wheat and that the shock of the explosion against the wheat in the bin was transmitted to the walls and carried to the point in the base where the walls failed. He also testified that in his opinion the breakout was not caused by the dead weight loading of the wheat.
 
 
 13
 Among the reasons which McDonald gave for his conclusions were these: The concrete was displaced a greater distance than it would have been by a mere structural collapse. The shattering of the concrete and the separation of the concrete from the reinforcing steel rods indicated that the failure had been abrupt and severe. This condition taken in connection with the damage to the concrete floor under the walls of the bins evidenced a shock load which could not have been caused by dead weight. The greatest displacement of bin 506 was at a point where there was no dead weight load. This in his opinion was damage by some force other than dead weight. There was no stretching or elongation of the reinforcing steel rods. This would be expected in the case of a structural collapse. The angle at which the wheat came to rest after the breakout was less than the usual angle of repose of wheat and indicated a force other than the mere collapse of the bin. The potential for a dust explosion was present at the time of the occurrence. The force of an explosion would be transmitted both through the wheat and through the voids in the wheat to increase the stress from the dead weight loading at the lower 25 to 30 feet of the bins, and such increased pressure would cause the walls to burst. He also considered the statements that there was a noise and the evidence of Graves that there was a swish of air from the area of bin 314 rather than a suction which would have caused an air movement in the opposite direction.[3]
 
 
 14
 For the defendants an insurance adjustor testified as to his examination of the premises on the day following the breakout and said that he found no evidence of an explosion. A physical chemist and three engineers, testifying for the defense as expert witnesses, said that there was no explosion and that the cause of the breakout was a structural failure. They were critical of the design and condition of the bins, stated unequivocally that the dead weight loading of the wheat in the weak structure exerted a sufficient force to rupture the walls, and were most positive in their disagreements with plaintiff's witness McDonald.
 
 
 15
 The only real dispute in the physical facts relates to whether there was an unusual noise at the time of the breakout. As to all other physical conditions the parties are in substantial agreement. The determination of the cause of the breakout depends upon the conclusions drawn from these facts. The plaintiff had one expert who testified that the cause was an explosion and not a structural failure. Four experts for the defendants gave evidence to the contrary. Where the evidence and the inferences reasonably deductible therefrom are such that reasonable minds may honestly draw different conclusions from them, the question presented is one of fact to be determined by the jury.[4] The appellate court takes the view of the evidence most favorable to the prevailing party and will uphold the verdict if there is substantial evidence to support it.[5] A verdict based on substantial evidence and approved by the trial court will not be disturbed on appeal.[6] The jury heard repeated over and over again the facts relating to plaintiff's elevator and the July 2, 1952, occurrence. Professorial lectures on obscure scientific subjects, complete with complicated mathematical computations and visual demonstrations, were presented at tiresome length. The mere fact that the jury disagreed with the defense experts does not destroy the validity of its verdict.
 
 
 16
 The insurance companies contend that there was no competent substantial evidence to sustain the verdict. First, they complain that moving pictures of experiments conducted by plaintiff's witnesses were improperly exhibited to the jury. They say that the plaintiff did not disclose at the pretrial conference the existence of or the intent to use the pictures, and as a result the defense was unfairly taken by surprise.
 
 
 17
 The record shows that at the second pretrial conference the understanding of the parties, with the approval of the court, was that neither side would be limited to the pictures which had been presented up to that time. The only mention of surprise during the course of the trial was when arrangements had been made for a preliminary showing of the pictures in the absence of the jury. One of the defense attorneys said that the proposal to show the pictures had taken the defense by surprise and he requested an opportunity to talk with his witnesses. This was granted.
 
 
 18
 Much time was then consumed in showing the pictures to counsel and their experts. Full opportunity was afforded for explanation and objection. The extensive cross-examination of the plaintiff's witnesses on the pictures dispels any possibility of prejudice on the ground of surprise. The admission in evidence of exhibits which were not referred to and included in a pretrial order was a matter within the discretion of the trial court.[7] The record before us shows no abuse of discretion in the admission of the pictures because of any claim of surprise.
 
 
 19
 The insurance companies further object to the pictures and testimony relating to the experiments upon the grounds that such experiments were misleading and were not performed under conditions substantially similar to those known to have existed at the time of the July 2, 1952, occurrence at the plaintiff's elevator. The motion pictures displayed several experiments illustrative of the principles recognized and applied by witness McDonald in reaching his opinions. Generally they concerned such matters as the presence of voids in stored wheat, loading and explosive pressures on the bottom, center, and top of a tank filled with wheat, and the transmission and effect of an explosive force. There was no claim that the conditions and situations involved in the experiments were identical or substantially similar to those existing in the plaintiff's elevator at the time of the breakout.[8]
 
 
 20
 At the request of defense counsel the court instructed the jury before each group of films was shown that 'they are admitted only for the purpose of illustrating certain principles which the plaintiff contends are applicable in this situation.' Such cautionary instruction was repeated in the court's final instructions to the jury.[9] No objection was made by defense counsel to the cautionary instructions.
 
 
 21
 It is clear that the experiments were presented to show principles and not to show what actually occurred. Defense counsel do not contend that an expert may not state the principles on which he bases an opinion. Indeed, in a case such as this, expert testimony would be of little value unless such principles were both stated and tested by cross-examination. The demonstrative evidence which was used was merely a means to 'enable or assist the witness to make an understandable communication of admissible matter with reasonable accuracy and expedition.' /10/
 
 
 22
 The admission of testimony of experiments is a matter resting largely within the discretion of the trial court.[11] The proper exercise of that discretion depends upon the situation in each case. Here, the question was whether the breakout was caused by dead weight loading alone or by such loading plus an explosive force. This involved consideration of pressures, stresses, strains, transmission of force, structural strength and other matters that are beyond the common knowledge of persons untrained in the subjects. The trial judge, after patiently viewing the pictures out of the presence of the jury, concluded that they were admissible to show the principles for which the plaintiff contended. He permitted the defense to perform experiments in the courtroom. He gave proper cautionary instructions. There is nothing before us to show any abuse of discretion.
 
 
 23
 Further objection is made that use of moving pictures was improper and that these pictures were not admissible because admittedly they had been edited and certain portions eliminated. A picture, still or moving, is admissible when it is shown that it is a correct likeness of the objects which it purports to represent. /12/ The question of the sufficiency of the preliminary proof to show the correctness of the picture rests largely in the discretion of the trial court. The matter of the editing of the film goes to the weight of the evidence and not to its admissibility.
 
 
 24
 The procedure followed and the rulings made by the trial court in relation to the motion pictures of the experiments disclose an exemplary fairness, caution, and recognition of applicable legal principles. There was no abuse of discretion. The pictures were properly received in evidence.
 
 
 25
 Objection is made that plaintiff's witness McDonald was wholly unqualified as an expert with respect to wheat dust explosions. The qualifications of a witness to testify as an expert are peculiarly for the trial court and its rulings in such regard are reviewable only for an abuse of discretion.[13] No abuse of discretion occurred here.
 
 
 26
 The insurance companies assert that McDonald was improperly permitted to invade and usurp the province of the jury in that the sole issue was whether there was an explosion and McDonald was allowed to testify that there was an explosion. The controlling rule as stated by the United States Supreme Court is that where the matter under inquiry is properly the subject of expert testimony, it is no objection that the opinion sought to be elicited is upon the issue to be decided. /14/ That rule has been followed in this circuit[15] and applied in two recent decisions.[16]
 
 
 27
 Defense counsel argue that McDonald should not have been permitted to express his opinions because they were 'contrary to admitted physical laws and facts.' Suffice it to say that there was a sharp conflict as to the pertinent physical laws and their application to the facts. The existence of this conflict did not make McDonald's testimony inadmissible.
 
 
 28
 In United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546, it was said:'* * * So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's we ought not to be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.'
 
 
 29
 The jury in the case at bar was left free to exercise 'its untrammeled judgment.' There was competent and substantial evidence to support the position of each party. The jury resolved the conflict in favor of the plaintiff. Its verdict is conclusive.
 
 
 30
 The instruction of the court on expert witnesses ended with the following:
 
 
 31
 '* * * In weighing the testimony of experts, however, the jurors have the right to take into consideration, in addition to the facts to be considered in weighing the testimony of all witnesses, the qualifications of the witness to testify as an expert and his apparent degree of superior knowledge and understanding of the scientific fact or facts involved.'
 
 
 32
 Defense counsel objected to this portion of the instruction on the ground that 'another factor to be weighted by the jury is the degree of experience which the particular expert has had with similar situations and conditions previously experienced by them.' All this amounts to is the claim that the qualification of experience should be singled out and particularly mentioned. This was not necessary. The general term 'qualifications' permits consideration of experience.
 
 
 33
 The trial court rejected defendants' requested instruction No. 21. This particularized the contentions of the defense that the breakout was caused by structural failure and set out the particular reasons on which reliance was placed. In an instruction given the court adequately presented to the jury the theory of the defense. It was not error to refuse the requested instruction.
 
 
 34
 The denial by the trial court of defendants' request for the submission of certain special interrogatories is objected to on the ground that it constituted an abuse of discretion. Under Rule 49(b) of the Federal Rules of Civil Procedure, 28 U.S.C., the submission of special interrogatories is within the discretion of the court. When the instructions given comprehensively cover all issues, there is no abuse of discretion in denying a request for special interrogatories.[17] Here, the charge to the jury was sufficient to justify the refusal of the requested interrogatories.
 
 
 35
 The remaining contention of the defendants on the main appeal goes to the closing argument of plaintiff's counsel. Without detailing the points raised it is enough to say that a reading of the arguments convinces us that the challenged portion did not unduly influence the jury or bring about a miscarriage of justice.[18]
 
 
 36
 On its cross-appeal plaintiff Flour Mills Company contends that the trial court erred in not allowing recovery of an attorney's fee. Section 40-908, Kansas G.S.1949, provides:
 
 
 37
 'That in all actions now pending, or hereafter commenced, in which judgment is rendered against any insurance company on any policy given to insure any property in this state against loss by fire, tornado, lightning or hail, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs: * * *.'
 
 
 38
 The policies in question[19] insure against 'fire and extended coverage.' The 'Supplemental Contract' relating to extended coverage has the following provisions:
 
 
 39
 '* * * the coverage of this policy is extended to include direct loss or damage by windstorm, cyclone, tornado, hail, riot, aircraft, draft animals, vehicles, earthquake, smoke damage and explosion * * *.'
 
 
 40
 'In this policy (but not in this Supplemental Contract) the word 'fire' shall be changed to include any peril or perils insured against under this Supplemental Contract, or loss or damage therefrom, as the case may be.'
 
 
 41
 The policy also contains the following explosion clause:
 
 
 42
 'In the interest of the insured the condition of this policy excluding loss or damage from explosion is hereby modified and this company shall be liable for any direct loss or damage to the property insured hereunder from explosion except as hereinafter provided.'[20]
 
 
 43
 So far as the policy is concerned, explosion is treated as a separate and distinct risk from that covered by the word 'fire.' Plaintiff's entire theory of the case expressed in its complaint, evidence and argument is that its loss occurred as a result of an explosion. Now it urges that fire includes explosion. The argument is without merit. The policy does not define fire to include explosion. Rather it insures against fire and then by 'Supplemental Contract' the insurance is extended to cover the additional risk of explosion.
 
 
 44
 The Kansas law is clear that a prevailing party is not entitled to recover attorney's fees unless such recovery is 'specifically authorized by statute, or by agreement.'[21] Flour Mills Company insists that the statute applies because in this case there is a judgment against an insurance company insuring Kansas property against loss by fire. In other words, it construes the statute as authorizing the recovery of attorneys' fees if the policy sued on protects against loss by fire even though the loss resulted from some other risk covered by the policy.
 
 
 45
 There is no Kansas authority on this point. In Ring v. Phoenix Assur. Co., supra, the defendant fire insurance company was held not liable for attorneys' fees when recovery was allowed on a hail loss.[22] The determinative question is whether the statute intends the type of policy or the type of loss to control. If the type of policy controls, then the effect of the statute is greatly expanded. The comprehensive coverage provisions of many insurance policies are practically all-inclusive in the risks against which they insure.
 
 
 46
 The policies insured against fire, explosion and other named risks, but we are dealing only with those portions of the policies which protect against loss by explosion. The statute authorizes allowance of attorneys' fees in cases involving loss 'by fire, tornado, lightning or hail.' It does not include loss by explosion. As we construe the statute, type of loss rather than type of policy controls.[23] There being no specific statutory authorization for attorney's fees they were properly disallowed.
 
 
 47
 The policies provided for payment 'within sixty days after such loss is proved.' Flour Mills Company claims that it is entitled to interest commencing sixty days after July 2, 1952. For consideration of this issue the eighteen defendant insurance companies must be divided into three groups, viz.: the Mill Mutuals group, the Lloyd's group, and the Home and Hartford group.[24] On December 9, 1954, the plaintiff, the Mill Mutuals group and the Lloyd's group stipulated that the 'maximum insurance' applicable to the damages unit was $77,447.45. Of this $24,358.47 was under Lloyd's policies and the remainder under Mill Mutuals policies. The court was authorized to enter judgment on the respective policies in the sums stated 'without proof of the amount of damage to said bins and interstices, if it was determined that he loss was covered by the policies. A similar stipulation was made by the plaintiff and the Home and Hartford group on February 11, 1955, covering losses with respect to the contends of the bins and business interruption. The total sum fixed by this stipulation was $32,020.63.
 
 
 48
 The judgment of the court allowed interest on the recoveries on the Mill Mutuals and Home and Hartford groups of policies from the respective stipulation dates and on the Lloyd's group from March 21, 1957, the date of judgment.
 
 
 49
 The Kansas rule is that interest is not recoverable on unliquidated claims until the amount due has been ascertained.[25] Plaintiff sued for a total of $296,507.48. The amount of recovery under the policies was not ascertained until the stipulations were made. Plaintiff says that this is immaterial as the amount recoverable was always subject to ascertainment by simple computation. No Kansas authority is cited for the proposition that interest is allowable after damages are certain or capable of being made certain by calculation. Even if that rule does prevail in Kansas, it has no application here. The amounts stated in the stipulation were the result of calculations of the defendants. A review of these calculations covers six pages in the record. The mathematical problems involved are not of a simple nature. There is no showing that the parties were in any agreement as to the method of calculation or the assumptions used in such calculations until the stipulations were signed. Under the circumstances, the amount due was not ascertained until the execution of the stipulations. The trial court properly allowed recovery of interest on the Mill Mutuals and Home and Hartford policies only from respective dates of the stipulations covering those policies.
 
 
 50
 On the Lloyd's group the court awarded interest only from the date of the judgment. Plaintiff claims that the liability for interest under the Lloyd's policies is the same as that under the other policies.
 
 
 51
 Each Lloyd's policy contained the following so-called 'Warranty Clause':
 
 
 52
 'Warranted same terms and conditions as and to follow the settlements of The Mill Mutuals and that said Company has at the time of any loss and at the same gross rate at least $780,000.00 (Subject only to reduction by amount of any loss not reinstated) on the identical subject matter and risk and in identically the same proportion on each separate part thereof.'
 
 
 53
 There is no controversy over the fact that such a clause is contained in the Lloyd's policies because the Lloyd's group had in this country no facilities for investigating and adjusting losses. For such services Lloyd's relied on domestic companies. In practical effect the operation of the warranty clause is that domestic companies are required to carry part of the risk and if those domestic companies are responsible for a loss, then Lloyd's is likewise responsible.
 
 
 54
 In this case the insurance companies vigorously contested the question of liability. This was determined adversely to them by the judgment. Counsel refer us to no authority decisive of the issue here presented.
 
 
 55
 If the position taken by Lloyd's is correct, then it would seem that the action on the Lloyd's policies was premature as that liability could not arise, according to their contentions, until it was determined that there was liability under the Mill Mutuals policies. However Rule 18(b) of the Federal Rules of Civil Procedure covers this situation and states that 'the court shall grant relief * * * only in accordance with the relative substantive rights of the parties.' Here the rights of the parties depend upon the warranty clause.
 
 
 56
 Plaintiff insists that the warranty clause is ambiguous and, hence, must be construed against the insurance carrier. We see no ambiguity. The language is 'to follow the settlements of The Mill Mutuals.' The question of liability under the Mill Mutuals policies was not settled until the judgment was entered. The liability of Lloyd's then follows. To date the liability of Lloyd's back to the dates of the stipulations is to ignore the word 'follow.'
 
 
 57
 Plaintiff then urges that the liability of Lloyd's for interest runs from the date of the verdict, May 3, 1955, rather than from the date of the judgment, March 21, 1957.
 
 
 58
 Rule 58, Federal Rules of Civil Procedure, provides:
 
 
 59
 'Unless the court otherwise directs and subject to provisions of Rule 54(b), judgment from the verdict of a jury shall be entered forthwith by the clerk; * * *. The notation of a judgment in the civil docket as provided by Rule 79(a) constitutes the entry of the judgment; and the judgment is not effective before such entry. * * *'
 
 
 60
 The record is silent as to what occurred when the verdict was returned. The record does not disclose any notation of the judgment in the civil docket until March 21, 1957, when the formal judgment was signed by the judge.
 
 
 61
 After the verdict the defendants filed a motion for judgment in accordance with a motion for directed verdict and a motion for new trial. These motions were heard and disposed of on January 24, 1957. At the conclusion of that hearing the court said 'judgment will be entered when I sign the Journal Entry.'
 
 
 62
 28 U.S.C. 1961, providing for interest on money judgments in civil cases, states that such interest shall be calculated from the date of the entry of the judgment.
 
 
 63
 The verdict did not determine the right of the plaintiff to attorneys' fees or to interest prior to judgment. It is clear that the trial judge did not intend that judgment should be entered until he signed it. The Journal Entry required by Rule 58 was not made until March 21, 1957. Under these circumstances there is no judgment upon which there could be a recovery of interest against the Lloyd's group until March 21, 1957.[26]
 
 
 64
 The judgment is affirmed.
 
 
 
 [1]
 Hereinafter referred to as plaintiff or Flour Mills Company
 
 
 [2]
 Hereinafter referred to collectively as defendants or insurance companies except in that portion of this opinion devoted to the issue of the liability of the insurance companies for interest
 
 
 [3]
 A defense witness testified concerning a structural failure of another elevator. He was at the top of the elevator and said that when the tanks went out 'it was just a big swoosh noise, like air suction sucked dust and stuff off the belt * * *.'
 
 
 [4]
 Superior Ins. Co. v. Miller, 10 Cir., 208 F.2d 700, 703
 
 
 [5]
 Loew's Inc., v. Cinema Amusements, 10 Cir., 210 F.2d 86, 93, certiorari denied 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115; Employers Liability Assurance Corporation v. Freeman, 10 Cir., 229 F.2d 547, 549
 
 
 [6]
 Stadia Oil & Uranium Company v. Wheelis, 10 Cir., 251 F.2d 269, 275; Magnolia Petroleum Co. v. Howard, 10 Cir., 193 F.2d 270; Dyess v. W. W. Clyde & Co., 10 Cir., 132 F.2d 972, 975; Cochran v. Order of United Commercial Travelers of America, 10 Cir., 143 F.2d 82, 85
 
 
 [7]
 Globe Cereal Mills v. Scrivener, 10 Cir., 240 F.2d 330, 335
 
 
 [8]
 Moore, the plaintiff's witness who performed the experiments, testified on cross-examination: 'We were not trying to build a model. These are not models of our grain elevator in any manner. We had no intention of making models. We are demonstrating principles.'
 
 
 [9]
 Typical of the cautionary instructions before the showing of a film is the following: 'Now, I want to say to you that I am admitting that evidence in the case merely for the purpose of illustrating to you certain principles that the expert witness, Mr. McDonald, contends exist and upon which he at least partially bases his expert opinion, and for that purpose only.' The final instruction on this point was this: 'In regard to certain evidence of experiments introduced in this case, which the jury has been instructed previously to consider for only limited purposes, I now instruct you again that the evidence of the experiments conducted by the witness Moore is not admitted for the purpose of showing whether or not an explosion occurred in the structure in question, and is not to be considered by you as any evidence of that fact. The evidence of these experiments is to be considered in regard to certain principles upon which the expert witness McDonald based his opinion and for this purpose only.'
 
 
 [10]
 Cf. American Law Institute, Model Code of Evidence, comment on Rule 105(j), p. 114
 
 
 [11]
 Navajo Freight Lines, Inc., v. Mahaffy, 10 Cir., 174 F.2d 305, 310. In that case this court held that the trial court did not abuse its discretion in rejecting experiment evidence relating to the coasting of a car from a filling station to a highway. It was held that similarity of conditions was not shown and that the proffered evidence was immaterial because there was other evidence of sufficient grade to permit a car to coast. The situation was not at all comparable with that presented in the instant case
 
 
 [12]
 Kortz v. Guardian Life Ins. Co., 10 Cir., 144 F.2d 676, 679, certiorari denied 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584
 
 
 [13]
 Chapman v. United States, 10 Cir., 169 F.2d 641, 645, certiorari denied 335 U.S. 860, 69 S.Ct. 134, 93 L.Ed. 406; Bratt v. Western Air Lines, 10 Cir., 155 F.2d 850, 853, 166 A.L.R. 1061, certiorari denied 329 U.S. 735, 67 S.Ct. 100, 91 L.Ed. 635; Korth v. Zion's Savings Bank & Trust Co., 10 Cir., 148 F.2d 170, 172
 
 
 [14]
 Eastern Transportation Line v. Hope, 95 U.S. 297, 298, 24 L.Ed. 477
 
 
 [15]
 Francis v. Southern Pac. Co., 10 Cir., 162 F.2d 813, 817, affirmed 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798; Nelson v. Brames, 10 Cir., 241 F.2d 256, 257
 
 
 [16]
 Cf. Equity Oil Co. v. National Fire Insurance Company of Hartford, 10 Cir., 247 F.2d 393, where the ultimate issue was whether there was a 'blowout' in an oil well and expert testimony was received on that point. In Nelson v. Brames, supra, expert testimony was held inadmissible on the point as to whether under the conditions shown an ordinarily careful and prudent automobile driver would have driven his car without chains. The difference between the two cases is apparent
 
 
 [17]
 Smith v. Welch, 10 Cir., 189 F.2d 832, 837
 
 
 [18]
 Cf. Pietch v. United States, 10 Cir., 110 F.2d 817, 822, certiorari denied 310 U.S. 648, 60 S.Ct. 1100, 84 L.Ed. 1414
 
 
 [19]
 The only policy appearing in the record is Certificate No. 5308 LP of Lloyd's Underwriters. It has a warranty that its terms and conditions are the same as 'The Mill Mutuals policy.' There being no contrary showing it is assumed that the terms of all policies as to risks insured against are the same as those set forth in Certificate 5308 LP
 
 
 [20]
 The exceptions are unimportant to this case
 
 
 [21]
 Evans v. Central Life Ins. Co., 87 Kan. 641, 125 P. 86, 88, 41 L.R.A., N.S., 1130; Ring v. Phoenix Assur. Co., 100 Kan. 341, 164 P. 303, 304
 
 
 [22]
 The decision does not indicate that the insurance policy in question in the Ring case also covered fire loss. After this decision the Kansas statute was amended to provide for allowance of attorneys' fees on hail insurance recoveries
 
 
 [23]
 If this is not the correct interpretation of the statute, there would result the anomalous situation that if there were a separate policy on the risk of explosion there could be no recovery of attorneys' fees but there could be such recovery if one policy covered both fire and explosion
 
 
 [24]
 One Hartford policy falls within the Mill Mutuals group and one Mill Mutuals policy is in the Home and Hartford group
 
 
 [25]
 Kansas G.S.1949, 16-201; Winfield Mortgage & Trust Co. v. Robinson, 89 Kan. 842, 132 P. 979, 981; Southern Painting Company of Tennessee v. United States, 10 Cir., 222 F.2d 431, 434
 
 
 [26]
 Cf. United States v. F. & M. Schaefer Brewing Co., 356 U.S. 227, 233-234, 78 S.Ct. 674, 2 L.Ed.2d 721